IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **PAUL MORGAN,** | **Case No. 2:09-cv-218** |
| **Plaintiff,** | **Judge Algenon Marbley** |
| v. | |
| **GINNY LAMNECK, et al.,** | **Magistrate Terence Kemp** |
| **Defendants.** | |

**OPINION AND ORDER**

**I.  INTRODUCTION**

This matter is before the Court on Defendants Virginia Lamneck, Oscar Young, Rich Pow, and Patricia Robinson's Motion for Summary Judgment.  (Doc. # 30.)  Defendants request summary judgment on Plaintiff Paul Morgan's claim of deprivation of his Eighth Amendment right to be free from cruel and unusual punishment.  In addition, Defendants assert they are protected from liability under the doctrine of qualified immunity.  For the reasons set forth below, Defendants' motion is **GRANTED** in part and **DENIED** in part.

**II.  BACKGROUND**

Plaintiff Paul Morgan is a first-time offender, incarcerated under a year's sentence, and at the time relevant to this action, was housed at the Correctional Reception Center ("CRC") in Orient, Ohio.  (Am. Compl., ¶¶ 1, 10.)  On October 13, 2007, Mr. Morgan was attacked by his cell-mate, Matthew Salett ("Inmate Salett"), and suffered injuries.  Inmate Salett, a transfer

1

inmate from another institution, was incarcerated under a life sentence for conviction of aggravated murder and aggravated robbery, and had violated numerous prison rules for acts of violence. (Pl.'s Resp., Exh. 5; Lamneck Depo., pages 63-75.)  Mr. Morgan and Inmate Salett were placed in the same cell in the Residential Treatment Unit ("RTU"), a mental-health unit of the CRC.  (Defs.' Mot., page 3; Pl.'s Resp., page 3.)

According to Ohio Department of Rehabilitation and Correction policy ("the Policy"), CRC is required to screen inmates for the express purpose of "identify[ing] inmates at reception who have violence indicators that would preclude them from housing in a cell at reception with a non-violent inmate or an inmate with a dissimilar sentence." (Pl.'s Resp., Doc. #37, Ex. 1.)  The "violence indicators" are set forth as follows:

> VI. PROCEDURES
> The Warden of each Reception Center shall designate, in writing, the staff member(s) authorized to determine the housing assignment of inmates received within the institution.
>
>> A. Reception staff shall screen newly arrived inmates for violence indicators upon their arrival in a reception center. These screenings will consider information from the available sources to include, but not limited to:
>>
>>> the Entry and Order from the committing court, the Rap Sheet, the Pre-Sentence Investigation, an interview with the inmate, records of previous convictions, records from previous commitments, and any information received from the county transport officers, can be verbal or written.

(Am. Compl., Exh. 1, page 2.)  The Policy includes directives to staff to review the following "violence indicators" to enable proper cell placement of inmates with similar traits and sentences:

> a. The offenses of conviction and commitment, to determine whether they are offenses of violence pursuant to the ODRC Security Classification Manual (Appendix A)

> b. The length of the inmate's sentence
> c. Indicators of violence through casual observation, including but not limited to tattoos, security threat group (STG) indicators, self-admissions, signs of conflict, threats and other relevant factors; and
> d. Requests for protective control.

Additionally, staff are directed "as soon as possible" to consider "any additional violence indicators," including "[h]istorical violent felony convictions," and "[p]rior institutional rules violations for assault of staff or inmates[.]" (*Id.*)

After review of his violence indicators, Mr. Morgan was assessed at reception as Level 1B, a low level on the security rubric. (Pl.'s Exh. 2; Lamneck Depo., page 53.) Typically, this initial assessment is sent to the Bureau of Classifications where the security classification is reviewed and, if appropriate, confirmed. (Lamneck Depo., page 54.) A security assessment for Inmate Salett is not part of the evidence before the Court, but according to the deposition of Defendant Warden Virginia Lamneck, Inmate Salett would have been assessed at a much higher security level because of his charges, his sentence, and various violence indicators. (*Id.*, pages 63-75.) In addition, Defendant Unit Manager Oscar Young testified that Mr. Morgan and Inmate Salett had "greatly dissimilar sentences," another Policy factor to be considered in assigning inmate housing. (Young Depo., page 27.)

However, according to Defendant Lamneck, irrespective of the Policy, all CRC inmates are assigned to a "temporary" security Level 3, and all inmates are housed at CRC as Level 3 inmates, with certain exceptions not relevant here. (Lamneck Depo., pages 58-59.) The receptions staff does its "best possible job" to separate the inmates according to violence-indicator assessment, but the security-level assessment is "really just designed to get [the inmates] to the proper institution once they leave [CRC]." (*Id.*, pages 60-61.) In addition, according to Defendant Lamneck, when an inmate is transferred to the RTU, as Mr. Morgan was,

3

the medical staff performs a mental-health screening that "trumps" the security screening. Thereafter, inmates are housed within the RTU according to the mental-health screening, not by security-level assessment or with regard to the violence indicators. (*Id*., page 85.) According to other deposition testimony, a decision was made that the Policy did not apply at all in the RTU, specifically the violence-indicator assessment. (Koehring Depo., Doc. # 40, pages 16-17; Thomas Depo., Doc. # 41, page 15.) On the other hand, Defendant Young testified that he believed the Policy did apply to the RTU, although he was uncertain whether the violence indicators were taken into consideration by the RTU medical staff when making cell assignments. (Young Depo., pages 20-21, 28). The Policy does not explicitly exclude the RTU, but both Defendants Lamneck and Young testified that within the RTU, all housing decisions are made by the medical staff. (Lamneck Depo., pages 81-82; Young Depo., page 38.) Any bases upon which the medical staff made their housing decisions are not in the record before the Court.

Mr. Morgan brings this action under 42 U.S.C. § 1983, alleging that Defendants were aware of a serious risk of harm from another inmate and yet failed to protect him, resulting in injury to him.[1] (Am. Compl., ¶ 1.) Defendants argue that Mr. Morgan has failed to state an actionable claim under § 1983 and, even if he had, qualified immunity protects them from suit. (Defs.' Mot. Summ. J., Doc. #30.)

---

[1] Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983.

4

### III. MOTION FOR SUMMARY JUDGMENT

The standard for summary judgment is well established. This standard is found in Rule 56 of the Federal Rules of Civil Procedure, which provides in pertinent part:

> The judgment sought shall be rendered if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c)(2007). Pursuant to Rule 56(c), summary judgment is appropriate if "there is no genuine issue as to any material fact . . . ." *Id*. In making this determination, the evidence "must be viewed in the light most favorable" to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). However, summary judgment is appropriate if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex Corp*., 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. "Once the moving party has proved that no material facts exist, the non-moving party must do more than raise a

metaphysical or conjectural doubt about issues requiring resolution at trial." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

Mr. Morgan concedes that summary judgment should be granted with regard to Defendants Pow and Robinson. (Pl.'s Resp., page 3, n.5.) Accordingly, as it relates to Mr. Morgan's claims against Defendants Pow and Robinson, Defendants' Motion for Summary Judgment is meritorious.

### A. Plaintiff's § 1983 Claim Against Defendants Lamneck and Young

To prevail on a claim under § 1983, a plaintiff must establish the violation of a right secured by the Constitution or laws of the United States by a person acting under color of state law. 42 U.S.C. § 1983; *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because Section 1983 is a method for vindicating federal rights, "not a source of substantive rights" itself, the "first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citations omitted).

Mr. Morgan alleges that Defendants Lamneck and Young violated his right to be free from cruel and unusual punishment secured by the Eighth Amendment to the United States Constitution. (Am. Compl. ¶ 1; U.S. Const. amend. VIII.) In moving for summary judgment, Defendants argue that because Mr. Morgan "cannot demonstrate that Defendants were aware of the fact that he was at imminent risk of being assaulted[,]" his claim fails. (Defs.' Mot., page 6, citing Morgan Depo., Doc. 29, pages 22-24.) Defendants argue further that they were not "deliberately indifferent" towards Mr. Morgan because they had no knowledge that Inmate Salett

6

was a threat to him, and, therefore, there was nothing Defendants could have done to protect him. (*Id.*, page 6.)

The Eighth Amendment imposes a duty upon prison officials "to protect prisoners in custody from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quotation omitted). Specifically, the Eighth Amendment forbids the "unnecessary and wanton infliction of pain[.]" *Id.* at 834 (citing *Wilson v. Seiter*, 501 U.S. 825, 834 (1991)). However, not every injury suffered by a prisoner results in constitutional liability against a prison official. *Id*. In order to succeed on a claim based upon the violence of a fellow inmate, a plaintiff must meet two requirements. *Id*. "First, the deprivation alleged must be, objectively, sufficiently serious," where the inmate "is incarcerated under conditions posing a substantial risk of serious harm." *Id.* (internal quotation marks and citations omitted). Second, a prisoner must show that the prison official had a "sufficiently culpable state of mind[,]" one of "deliberate indifference to inmate health and safety." *Id.* (internal quotation marks and citations omitted). Under the *Farmer* test, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. Accordingly, "[t]he test for deliberate indifference contains both a subjective and an objective component." *Flint*, 270 F.3d at 352.

In their Motion, Defendants do not dispute the first prong of the inquiry, that the alleged deprivation to Mr. Morgan's constitutional rights was objectively substantially serious. Defendants acknowledge the existence of the Policy, its applicability to the CRC, and its requirement to assess all inmates' "violence indicators" for the express purpose of identifying violent inmates and precluding them from sharing a cell with a nonviolent inmate. Instead,

7

Defendants disclaim personal responsibility "for classification decisions, mental health classification decisions, or cell assignments involving Mr. Morgan or his cell-mate." (Reply, page 2.) Thus, Defendants focus solely on the subjective prong of the deliberate-indifference test, arguing that they lacked the requisite state of mind.

> None of these Defendants were [sic] deliberately indifferent towards Morgan. Based on Morgan's own testimony, none of the Defendants had any sort of knowledge that [Salett] was a threat to Morgan. There was nothing Defendants could have done to protect Morgan in light of the fact that they had no knowledge that he needed protection.

(Defs.' Mot., page 6.) Defendants misinterpret the subjective test for deliberate indifference, as evidenced by their reliance on a lack of personal knowledge of Mr. Morgan's individual danger. Mr. Morgan need not demonstrate Defendants' deliberate indifference to *his* safety; instead, he must demonstrate that despite awareness of the danger to nonviolent inmates housed with violent inmates, Defendants placed him in danger when they ignored the Policy regarding appropriate screening and housing of inmates. *Farmer v. Brennan,* 511 U.S. 825, 842 (1994). Whether or not Mr. Morgan can prevail is not the issue before the Court; whether there exists a genuine issue of material fact is the question the Court must address.

In *Taylor v. Mich. Dep't of Corrections*, 69 F.3d 76 (6th Cir. 1995), the Sixth Circuit reversed the district court's grant of summary judgment where an inmate was raped after being transferred to another facility. In so doing, the Court held that material issues of fact remained on the issue of whether the warden failed to take reasonable steps to ensure that vulnerable inmates would not be transferred to a facility where a substantial risk of harm existed.

> A jury could find on the facts that [the warden] personally had a job to do, and that he did not do it. A jury could find that the fact that [the warden] was under constant pressure to transfer inmates due to overcrowding would not excuse his failure to adopt reasonable policies to insure that the transferees were not placed in

8

> grave danger of rape.  In sum, a triable question exists about
> whether [the warden] properly discharged his duty.

*Id.* at 81 (internal citation omitted).   The *Taylor* Court specifically addressed the defendant warden's argument that because the warden had no personal knowledge of the plaintiff's "particular vulnerabilities" he was not liable.  "*Farmer* makes it clear that the correct inquiry is whether [the warden] had knowledge about the substantial risk of serious harm to a particular class of persons, not whether he knew who the particular victim turned out to be."  *Id.* at 81, citing *Farmer v. Brennan*, 511 U.S. 825 (1994).

In *Crutcher v. Edwards*, 2002 U.S. Dist. LEXIS 27983 (Case No. C2-01-1159, September 30, 2002, S.D. Ohio), this Court denied a defendant prison official's motion for summary judgment where the prison official disclaimed personal responsibility for the placement of a particular plaintiff in a cell with another, more violent cell-mate who ultimately caused severe injuries to plaintiff.  In that matter, the defendant acknowledged the existence of a classification and housing policy which "permitted maximum security inmates to be celled with minimum security inmates."

> In his deposition, Mr. Edwards does not deny knowledge of that
> policy, and it is clear that, as the warden of the institution,
> decisions concerning the adoption and maintenance of such
> institution-wide policies were his to make.  Consequently, although
> Mr. Edwards cannot be held responsible under § 1983 for the
> actions of members of his staff about which he had no knowledge,
> he may still be held liable to Mr. Crutcher if, under the applicable
> case law, his awareness and maintenance of CRC's classification
> of housing policy can be considered to have been deliberate
> indifference to the health or safety of CRC inmates.

*Id.* at *12-13.

So, too, here, Defendant Lamneck acknowledges the existence of the Policy and its express purpose to screen inmates using "violence indicators" to prevent same-cell housing of

9

violent and nonviolent inmates. (Lamneck Depo., pages 60-61.) Further, Defendant Lamneck acknowledges that the Policy is mandatory. (*Id.*, page 20.) And yet, as evidenced throughout her deposition testimony and that of Defendant Young and non-parties Deputies Thomas and Koehring, application of the Policy and its screening requirements was construed as discretionary, both in reception and in the RTU. Whether Defendant Lamneck's interpretation of the Policy—that it permits a global assignment of Level 3 classification to all reception inmates and that it does not apply at all to the RTU—amounts to deliberate indifference is a triable issue of fact. *Taylor,* 69 F.3d at 81 (finding a jury question where the warden was charged with abandoning his duties in implementing a policy regarding inmate transfer). Furthermore, that the RTU is somehow exempt from application of the Policy—as Defendant Lamneck argues—or subject to a different housing policy is not supported by any evidence before the Court. A jury could find on the facts in the record that Defendants' determination that the Policy need not be followed in reception—because the security classification was relevant only to an inmate's placement in a "parent facility"—or in the RTU—because the security classification was "trumped" by the mental-health assessment—would not excuse their failure to ensure the safe housing of inmates.

Because there remains a genuine issue of material fact as to whether Defendants' interpretation and application of the Policy can be considered to be deliberate indifference to the health and safety of CRC inmates, Defendants' Motion for Summary Judgment regarding Mr. Morgan's § 1983 claim as asserted against Defendants Lamneck and Young is **DENIED.**

### B. Qualified Immunity

The second issue raised by Defendants' motion is whether they are entitled to protection from suit under the doctrine of qualified immunity. (Defs.' Mot. Summ. J., pages 11-12.) "[I]n

order for a court to deny qualified immunity to a § 1983 defendant, the plaintiff must establish that [a defendant's] conduct violated a federal right so clearly established that any official in his position would have understood that he was under an affirmative duty to refrain from such conduct." *Doe v. Bowles*, 254 F.3d 617, 620 (6th Cir. 2001) (quoting *McCloud v. Testa*, 97 F.3d 1536, 1541 (6th Cir. 1996)) (internal quotation marks omitted). When the defense of qualified immunity is raised by motion, "the district court must decide the purely legal question of whether the law at the time of the alleged action was clearly established in favor of the plaintiff." *Dominique v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987). In the context of a motion for summary judgment, the Court must decide the qualified immunity on the basis of those facts which are most favorable to the plaintiff's case.

The Court must undertake a three-step analysis in determining whether qualified immunity applies. First, the Court should identify the specific constitutional right that the defendants allegedly violated. Here, Mr. Morgan's claim implicates his right to be free from assault from another inmate, a claim arising under the Eighth Amendment. As discussed *supra*, the Eighth Amendment generally prohibits prison officials from being "deliberately indifferent" to the health or safety of prison inmates and, as a result, causing the inmates to suffer unnecessary pain or injury. There is no dispute that Mr. Morgan had an Eighth Amendment right to be free from assault committed by another inmate if the deliberate indifference of prison officials was a contributing factor in that assault. The Sixth Circuit has held on several occasions that such deliberate indifference of a prison official is of "constitutional magnitude." *Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir. 1990). As a result, Mr. Morgan is able to establish that he had a constitutional right that was clearly recognized by applicable precedent.

The second question in the qualified-immunity inquiry is whether there are facts in the record from which a reasonable person could infer that Mr. Morgan's constitutional right was violated. As set forth above, *Farmer* sets forth a two-part inquiry regarding a prison official's liability for inmate-on-inmate violence: the prison official was both aware of and disregarded a substantial risk to inmate health and safety. Here, taking the facts in a light more favorable to Mr. Morgan, a jury could find that Defendants were aware of the risk of substantial harm—as evidenced by their awareness of the Policy and its purpose—and that they disregarded the risk by assigning a "temporary Level 3" classification to all inmates in reception and by ignoring the Policy in RTU-housing decisions. By abdicating the Policy at the door of the RTU, Defendants disregarded an ODRC regulation designed to ensure inmate safety. Although the Defendants claim that the RTU used its own means of assessing appropriate housing assignments, there is no evidence in the record showing that the RTU housing policy addressed the serious safety risks created by housing inmates with different propensities for violence together. Indeed, there is no RTU housing policy in evidence, nor is there a record of the RTU assessments of Mr. Morgan or Mr. Salett. Finally, Defendants offer very little in support of their assertion that they did not violate Mr. Morgan's constitutional rights. They merely state that they "did not violate Morgan's constitutional rights" and "did not subject Morgan to cruel and unusual punishment." (Defs.' Mot., page 12.) Therefore, under a reading of the facts in the light most favorable to Mr. Morgan, a trier of fact could find in his favor on the constitutional issue.

The Court must now turn to the last question in its inquiry: whether the law was so clearly established at the time of the assault that a reasonable warden in the position of Defendant Lamneck and a reasonable unit manager in the position of Defendant Young would have been aware that a failure to house inmates according to the Policy's violence indicators in

12

both Reception and in the RTU could constitute deliberate indifference to the safety of nonviolent inmates.

In *Marsh v. Arn*, 937 F.2d 1056, 1062 (6th Cir. 1991), the Sixth Circuit recognized the principle that the failure to segregate inmates according to their tendency for violence or the nature of their offenses can constitute deliberate indifference where there is evidence that such a failure creates a pervasive risk of harm.  Indeed, the Policy at issue states that CRC is required to screen inmates for the express purpose of "identify[ing] inmates at reception who have violence indicators that would preclude them from housing in a cell at reception with a non-violent inmate or an inmate with a dissimilar sentence."  (Pl.'s Resp., Exh. 5.)  The Policy was issued by the ODRC on February 22, 2003, well before the assault to Mr. Morgan occurred in October 2007.  Defendant Lamneck acknowledges both the existence of the Policy and its purpose.  If, as Defendant Lamneck argues, the RTU was exempt from application of the Policy, there is no evidence before the Court that any policy was followed in the RTU with regard to safely housing inmates.  A trier of fact could find that a reasonable warden would have been aware of the Policy, aware of its express purpose, and aware that a failure to follow its directives by housing violent and nonviolent inmates in the same cell could constitute deliberate indifference to the safety of the nonviolent inmates.

In support of their assertion of qualified immunity, Defendants merely state that they acted in "good faith based on existing law at the time of the incident."  (Defs.' Mot., page 12.) Further, Defendants argue, "[t]here is no established case law that prison officials are liable for failing to protect an inmate where he is attacked without knowledge of any prior threat or danger."  (*Id.*)  However, *Farmer* and *Taylor* stand for the proposition that a prison official can

13

be liable for a failure to protect an inmate, even without specific knowledge of danger to a particular inmate.

Based on the foregoing, this Court finds that it was clearly established that a warden's failure to follow the Policy and its screening and housing directives violated the constitutional rights of nonviolent inmates if there was evidence that such a practice created a pervasive risk of harm. Because the record in this case contains evidence from which that can be inferred, qualified immunity is not available to Defendant Lamneck.

Defendant Young presents a somewhat closer question. Unlike Defendant Lamneck, Defendant Young was not in a position of authority for policy decisions at the CRC or the RTU. However, Defendant Young testified that, as unit manager of the RTU, he was responsible for inmate housing. (Young Depo., page 5.) He also testified that he was aware of the Policy, he believed it applied to the RTU, and that he was aware of the danger of housing together violent and nonviolent inmates. Defendant Young was apparently convinced, however, that despite his stated housing duties, cell assignments within the RTU were the exclusive province of the medical staff. (*Id.,* page 38.) Therefore, a jury could find that Defendant Young acted unreasonably, and therefore, qualified immunity is not available to Defendant Young.

## IV. CONCLUSION

Based on the foregoing, Defendants' Motion of Summary Judgment (Doc. # 30) is **GRANTED** as to Defendants Pow and Robinson only, who are accordingly **DISMISSED** from

this action.  With regard to Defendants Lamneck and Young, the Motion for Summary Judgment is **DENIED**.

      **IT IS SO ORDERED.**


Dated:  March 24, 2011                                                  <u>s/Algenon L. Marbley</u>
                                                                                                      Algenon L. Marbley
                                                                                                       United States District Judge